**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Application of<br><br>Petrus Advisers Ltd,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 26-<br><br>[redacted]<br>Original Version Filed: June 18, 2026<br>Public Version Filed: June 24, 2026 |

**DECLARATION OF DANIEL RADIG IN SUPPORT OF THE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

I, Daniel Radig, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a German-qualified attorney (*Rechtsanwalt*), admitted to practice law in the Federal Republic of Germany. I submit this Declaration in support of the Application filed by Petrus Advisers Ltd. ("Petrus" or "Petitioner") for an order pursuant to 28 U.S.C. § 1782 granting leave to obtain discovery for use in German criminal and civil proceedings (the "German Proceedings").

2. Petitioner is a London-based regulated investment manager.

3. Petitioner seeks to serve a subpoena for the production of documents on the Carlyle Group Inc. ("Carlyle"), an American multinational private equity firm incorporated in Delaware and headquartered in Washington, D.C., with offices throughout the United States and worldwide.

4. The German Proceedings include civil and criminal proceedings against, among others, Wolfgang Marguerre, Karl Biesinger, Jens Amail, Andreas Röderer, Christian Diener, Cai Berg, and the members of the Executive Board and Supervisory Boards of Schneider-Neureither & Partner SE ("SNP").

5. SNP is a publicly listed German enterprise software company that specializes in software tools for SAP system transformations and data migrations and is listed on the Frankfurt Stock Exchange under the ticker SHF.

6. The relevant facts revolve around a share purchase agreement between Petitioner and Wolfgang Marguerre for 100,000 shares of SNP dated [redacted] (the "2024 SPA"), and Carlyle's subsequent tender offer and acquisition of SNP, announced on December 23, 2024.

7. I represent Petitioner in the German Proceedings as its German counsel.

## I. THE FACTS

8. I understand that Petitioner intends to allege the following facts as part of both the pending and forthcoming German Proceedings discussed below.

9. I understand[1] from Petitioner that Marguerre's involvement with SNP, and his relationship with Petitioner as a fellow shareholder, pre-dates the events of 2024. In May 2023, Octapharma AG (a pharmaceutical company controlled by Marguerre) acquired 694,192 SNP shares (representing approximately 9.4% of SNP's share capital at the time) from Petitioner pursuant to a share purchase agreement dated May 17, 2023 (the "2023 SPA"), at a price of no more than €33.50 per share. The transaction closed on July 4, 2023.

10. [redacted]

[1] Where I make statements on the basis of information and belief, I note that my understanding in the rest of the same paragraph is based on information received directly from Petitioner. Such statements are made on the basis of information and belief because either: (i) I could not independently verify such facts without breaking privilege or confidence, or (ii) the subject matter is beyond my area of expertise or perception.

[redacted]

11. As a result of Marguerre's acquisition, his combined direct and indirect shareholding in SNP crossed a 30% holding threshold, obliging Octapharma AG to launch a public takeover offer for all outstanding SNP shares, which was made at the price of €33.50 per share. Following the public takeover offer, which was completed on August 16, 2023, Marguerre held approximately 65% of SNP's outstanding share capital, making him SNP's controlling shareholder.

12. On October 28, 2024, Petitioner, represented by its director Klaus Umek, signed a second share purchase agreement (the "2024 SPA"), which was countersigned by Mr. Marguerre on [redacted].[2] The 2024 SPA provided for a purchase price of €[redacted] per share and included [redacted]

[2] It is unclear whether the 2024 SPA was executed by Marguerre on [redacted]; the one day difference is immaterial for all relevant purposes.

13. The 2024 SPA was executed in the context of a sale process of SNP, which ultimately ended in Carlyle's acquisition of more than 75% of SNP (including Marguerre's stake).

14. Petitioner will allege, based on information and belief, that while the *formal* sale process for SNP that eventually culminated in the Carlyle transaction commenced no later than August 2024 ([redacted]), significant preparatory steps for the process (*e.g.*, informal appointment of transaction advisers) may have started in Q1 of 2024. I understand from Petitioner that [redacted], a person in Marguerre's immediate circle verbally communicated to a director of Petitioner that Marguerre deliberately and in bad faith timed the commencement of the formal sale process so as to ensure that [redacted]. Petitioner will allege that the damages this caused are the difference between [redacted] and €61.00 per share (the price for which SNP ultimately was sold to Carlyle at the end of 2024) applied to 694,192 shares, resulting in a *prima facie* claim of at least approximately €19.0 million.

15. Petitioner will allege, based on information and belief, that beginning in approximately August 2024, Marguerre finalized the appointment of the advisory firm ParkView Partners GmbH ("ParkView") to conduct a formal structured sale process for his controlling stake in SNP. But conversations with ParkView about an engagement had commenced (based on Petitioner's understanding) in Q1 2024, at which point ParkView started working on the take-private process.

16. Petitioner will allege, based on information and belief, that ParkView contacted over [redacted] potential investors, who were required to execute non-disclosure and confidentiality agreements before receiving any confidential information about SNP. Carlyle, represented by certain of its subsidiaries, was among the parties that signed NDAs and received confidential

information. By the end of October 2024, the pool of potential bidders had been narrowed from over [redacted] to approximately [redacted], including Carlyle. The narrowing of potential bidders for a transaction of this nature typically implies that indicative bids were received and evaluated by ParkView and Marguerre.

17. I understand from Petitioner that Marguerre commissioned KPMG AG Wirtschaftsprüfungsgesellschaft ("KPMG") to provide the manpower to assist SNP's management and employees in preparing [redacted], later called the "KPMG Financial Factbook" for Project Succession (the internal code name for the SNP sale transaction). At its core, the document is: [redacted]. The final draft of the KPMG Financial Factbook was addressed [redacted] and was completed no later than [redacted].

18. The KPMG Financial Factbook contained [redacted]

3 [redacted]

19. [redacted]

20. [redacted] Petitioner received the KPMG Financial Factbook in May 2026.

21. The KPMG Financial Factbook is the central documentary evidence underpinning the German Proceedings generally and, in particular, Petitioner's application to set aside the partial award described below.

22. [redacted]:

[redacted]

4 [redacted]

5 [redacted]

23. In my opinion, the KPMG Financial Factbook and the progressed nature of the SNP sale process represented a body of non-public price-sensitive information of high materiality, and, as such, Marguerre's purchase of 100,000 SNP shares from Petitioner while in possession of such information constituted insider dealing in violation of Article 14 of the EU Market Abuse Regulation (MAR) in conjunction with Article 8 MAR.

24. In addition, Petitioner will allege that throughout the fall of 2024, Dr. Karl Biesinger, who served simultaneously as Marguerre's attorney and the Supervisory Board Chairman of SNP, coordinated the sale of SNP to Carlyle and actively concealed the advanced state of the sale process from Petitioner. At no point during the negotiation of the 2024 SPA did Marguerre disclose to Petitioner that: (i) a structured sale process for SNP was actively underway and had been since at least August 2024; (ii) NDAs had been signed with over [redacted] potential bidders; (iii) the bidder pool had been narrowed to approximately [redacted] parties, including Carlyle; or (iv) a KPMG Financial Factbook existed showing that [redacted]. Petitioner will further allege that had it known any of these facts, it would not have sold its shares at €[redacted] per share.

25. On December 23, 2024, SNP publicly announced that it had entered into an investment agreement with an affiliate of Carlyle, which included Carlyle's intention to launch a voluntary public takeover offer for all outstanding SNP shares at €61.00 per share. The announcement confirmed that Carlyle had already secured the support of Marguerre through a share purchase agreement covering approximately 65% of SNP's outstanding share capital, which was comprised of Marguerre's own direct and indirect holdings and the 100,000 shares previously acquired from Petitioner pursuant to the 2024 SPA. Carlyle had also received irrevocable undertakings to tender other shareholders' shares for an additional approximately 11% of SNP.

The acquisition by Carlyle was formally closed on April 10, 2025; as part of the transaction, approximately 3% of the independent shareholders considered the offered price of €61.00 attractive and tendered, causing Carlyle to achieve a total holding of approximately 78% of SNP.[6] SNP shares have since traded as high as €86.60 per share and currently trade at approximately €82-83 per share.

26. The share purchase agreement between Marguerre and Carlyle's acquisition vehicle, Succession German BidCo GmbH (the "Succession SPA") [redacted], contained specific provisions [redacted]

[6] Carlyle disclosed a shareholding of 77.78% after closing. Prior to the tender, Carlyle held 0.95%; as part of the SNP acquisition, Marguerre tendered 65.19% and Carlyle announced further irrevocable undertakings to tender that led to additional holdings of 11.06%. This implies that 2.5% of the remaining independent shareholders tendered their shares.

[redacted].

27. Petitioner will allege that in the period between December 19 and December 22, 2024, Dr. Biesinger subjected Mr. Umek to a sustained campaign of pressure and threats, demanding that Petitioner procure additional SNP shares for delivery into the Succession German BidCo GmbH offer. These alleged threats included threatening to report Mr. Umek to the German financial regulator BaFin, to commence legal proceedings against him personally, and to notify Petitioner's investment clients of Petitioner's non-compliance. This campaign of duress was conducted late at night, including with various messages sent as late as 10:30 p.m. on Saturday, December 21, 2024, the weekend before Christmas. Petitioner will further allege that the SNP takeover offer was in any event announced on schedule on the morning of December 23, 2024, demonstrating that the threats had no legitimate basis and were designed solely to pressure Petitioner into delivering additional shares.

28. According to the publicly available Joint Reasoned Statement of SNP's Management Board and Supervisory Board recommending the Carlyle offer to SNP shareholders, Marguerre intended to gift Dr. Jens Amail, SNP's CEO (and his family) an amount equal to 10% of Marguerre's capital gain from the Carlyle transaction. Petitioner will allege that this gift, made by the controlling shareholder of SNP, to the CEO of the SNP, is likely to translate to tens of millions of euros.

29. As I understand from Petitioner, following the Carlyle acquisition, SNP, in coordination with Carlyle, proceeded to conclude a domination and profit transfer agreement

(*Beherrschungs- und Gewinnabführungsvertrag*) with the Carlyle subsidiary Succession German Bidco GmbH. Under § 293b AktG, such an agreement requires independent auditors to review the adequacy of the compensation offered to minority shareholders. ValueTrust Financial Advisors Deutschland GmbH ("ValueTrust") and A&M GmbH Wirtschaftsprüfungsgesellschaft ("Alvarez & Marsal" or "A&M") acted as the § 293b AktG auditors. Alvarez & Marsal was appointed by court order, ValueTrust was appointed by SNP. The Fairness Opinions issued by ValueTrust (dated May 15, 2025) and A&M (dated May 20, 2025) were based upon business plan projections submitted to the auditors by SNP management. SNP's CEO, Dr. Jens Amail, was responsible for submitting SNP's business plans to the auditors. The submitted revenue and EBITDA projections were [redacted]

30. [redacted]

[redacted]

[redacted]

---

7 [redacted]

8 [redacted]

31. Petitioner will further allege that, in the period between the release of the KPMG Financial Factbook [redacted] and the dates of the § 293b auditor valuations (May 2025), SNP published three quarterly earnings announcements, each of which confirmed strong performance of the company. Specifically: (i) on November 7, 2024, SNP's Q3 2024 report was published, stating: "Outlook for 2024 as a whole raised for the second time"; (ii) on March 27, 2025, SNP's full-year 2024 results were published, stating: "SNP optimistic about 2025 after another record year"; and (iii) on May 8, 2025, SNP's Q1 2025 results were published, stating: "After two record years, SNP kicks off 2025 with the best Q1." Petitioner will assert that there are therefore no developments in the business between [redacted] to May 2025 to justify submitting a material downward revision to [redacted] to the § 293b auditors.

32. Using the [redacted] projections, the fairness opinions found the compensation payment offered to minority shareholders, €61 per share, to be appropriate.

33. At the general meeting held on June 30, 2025, SNP management stated on the record that "no medium-term plans were prepared in 2023 and 2024; only annual budgets were produced." Petitioner will allege that these statements are demonstrably false. [redacted] Petitioner's case in the German Proceedings is that, if SNP management knew in 2024 that a

detailed business plan existed but subsequently represented to shareholders and the § 293b auditors that no such plan existed, this would constitute serious violations of civil and criminal law.

34. Petitioner will further allege that, more recently, in February 2026, Marguerre obtained detailed confidential information about SNP shareholders: specifically, confidential data regarding share ownership of several institutional shareholders, including Petitioner and certain other third parties. This information appears to have been obtained pursuant to the procedure under § 67d of the German Stock Corporation Act (*Aktiengesetz*), which permits a company to request from its share register agent information regarding the identity and shareholdings of its registered shareholders. This right is vested exclusively in the company itself, and neither the controlling shareholder nor any other third party is entitled to exercise this right or to receive the resulting data. In other words, Marguerre was not entitled to this information.[9]

## II. THE GERMAN PROCEEDINGS FOR WHICH DISCOVERY IS SOUGHT AND THEIR STATUS

35. The discovery sought by Petitioner through this Application is intended for use in multiple German criminal and civil proceedings.

36. Neither Carlyle nor any of its affiliates are actual or anticipated named parties to any of the German Proceedings.

### A. The Cease-and-Desist Proceeding

37. Petitioner has filed an interim injunction (*einstweilige Verfügung*) for cease-and-desist proceedings against Marguerre before the competent German court in Heidelberg on May

[9] According to Petitioner, Mr. Amail, SNP's CEO, was in a position to procure or facilitate the transmission of this information to Marguerre; Petitioner does not exclude the possibility that Amail was the source.

28, 2026 (file number 3 O 183/26) (the "Cease-and-Desist Proceeding"). A true and correct copy, and a machine translation, is attached hereto as **Exhibit A**.

38. The Cease-and-Desist Proceeding seeks orders requiring Marguerre to cease conducting a public advocacy campaign directed at Petitioner [redacted]

39. In the Cease-and-Desist Proceeding, the deadline for Marguerre to respond is June 17, 2026. Petitioner will have the opportunity to submit evidence in further support of the requested relief up until the point at which the court issues a ruling in the Proceeding, which is, while at the court's discretion, expected within approximately five weeks of the June 17, 2026 deadline for Marguerre's response.

40. However, should the interim injunction requested by Petitioner in the Cease-and-Desist Proceeding not be granted, Petitioner may appeal and will be able to submit new evidence as part of that appeal.[10]

---

10 [redacted]

**B. Forthcoming Civil Proceeding**

41. Petitioner, to my understanding, also intends to commence civil proceedings against Marguerre for fraudulent misrepresentation under §§ 123, 826 German Civil Code (*Bürgerliches Gesetzbuch,* or "BGB") arising from the negotiation and execution of the 2024 SPA. Petitioner is awaiting the outcome of the Cease-and-Desist Proceeding before filing this contemplated civil proceeding. The pre-action correspondence required to commence this contemplated civil proceeding has already been sent, and Petitioner intends to commence such proceeding as soon as a ruling in the Cease-and-Desist Proceeding has been delivered.

42. Petitioner seeks the annulment of the 2024 SPA *ex tunc* and the return of the 100,000 SNP shares it sold to Marguerre. In lieu of return of such shares, Petitioner seeks damages reflecting the true value of those shares, which, to my understanding, Petitioner sets out as follows:

- At a minimum, the value of the shares to be recovered from Marguerre is their current trading price (currently, approximately €83 per share);
- In the alternative, the value of the shares to be recovered from Marguerre is the value of such shares as determined in the pending appraisal proceedings (*Spruchverfahren*) concerning SNP. Although Petitioner is not a party to those proceedings, the resulting valuation is applicable to all shareholders and will therefore apply equally to the shares recovered by Petitioner from Marguerre. Petitioner believes that the court in the appraisal proceedings will value SNP on the basis of the KPMG Financial Factbook (the existence of which is public knowledge), and using standard valuation methodology applied in German appraisal proceedings, the Petitioner expects those shares to be worth at least €140 per share.

43. Petitioner is also preparing civil proceedings against Marguerre under § 1059 German Code of Civil Procedure (*Zivilprozessordnung,* or "ZPO"), against the enforcement of a certain payment award of €138,245 by Petitioner to Marguerre. Petitioner's argument in these

---

[redacted]

proceedings is two-fold: firstly, the payment award, based on the 2024 SPA, ought to be annulled as against public order, on the basis that the 2024 SPA resulted from fraud and insider trading; secondly, because the 2024 SPA was allegedly underpinned by fraud and insider trading, it ought to be annulled on an *ex tunc* basis (including the arbitration clause, *see* ¶ 39, n.10 *supra*), and without a 2024 SPA, there is no basis for a payment award. The documents sought in this Application are core to the argument in these proceedings, as the level of engagement and conversations between Carlyle and Marguerre will provide evidence in respect of the allegedly fraudulent conduct and insider dealing by Marguerre.

44. The KPMG Financial Factbook is the evidentiary cornerstone of all civil proceedings against Marguerre laid out in this Section, as Petitioner alleges that the 2024 SPA was procured through insider dealing and fraud because Marguerre possessed material non-public information demonstrating that SNP's prospects were dramatically more favorable than the market understood. The documents Petitioner seeks from Carlyle, including Carlyle's own valuation of SNP prepared with full access to the KPMG Financial Factbook and the records showing how far the SNP sale process had advanced at the time of the 2024 SPA, are critical to corroborate Petitioner's claims in the civil proceedings.

**C. Other Contemplated Proceedings**

45. In addition to the civil proceedings described above, I understand that Petitioner is in the process of preparing and filing:

- A criminal complaint against SNP board members and potentially their advisors alleging fraud (§ 263 StGB (German Criminal Code)) and breach of § 400 AktG (German Stock Corporation Act) for submitting inaccurate business plans to the § 293b AktG auditors;
- A criminal complaint against SNP management and potentially their advisors for stating at the general meeting of June 30, 2025, that no medium-term plans

were prepared in 2023 and 2024, which is in conflict with the existence of [redacted] and could constitute a violation of § 400 AktG;

- A criminal complaint against Marguerre and potentially his advisors for the criminal procurement and use of the confidential shareholder data constituting trade secrets (*Geschäftsgeheimnisse*) under § 4(2)(3) GeschGehG (German Trade Secrets Act), including under § 23 GeschGehG, and against Dr. Amail for providing those documents to Marguerre, whether directly or in his capacity as CEO of SNP; and

- Civil proceedings against Marguerre for breach of [redacted] (in breach of § 242 BGB).

46. The proceedings described herein are at various stages of preparation and filing. Petitioner only received the KPMG Financial Factbook in May 2026. The KPMG Financial Factbook is the central documentary evidence underpinning the criminal complaints against Marguerre for insider dealing and fraud, against the SNP board members for the submission of false business plan projections to the § 293b auditors and for false statements at the general meeting denying the existence of a 2024 business plan. Now that Petitioner has obtained the KPMG Financial Factbook, it and its German counsel are working closely to finalize and file those complaints with the competent prosecutorial authorities. Petitioner intends to file these proceedings within the next three months.

## III. UNAVAILABILITY OF COMPARABLE DISCOVERY IN GERMAN PROCEEDINGS

47. German judicial procedure in civil matters is primarily governed by the Code of Civil Procedure. German criminal procedure is governed by the Code of Criminal Procedure (*Strafprozessordnung,* or "StPO"). Neither code provides mechanisms comparable to U.S.-style pre-trial discovery.

48. Under § 142 ZPO, a German civil court may, in its discretion, order a party or a third party to produce specified documents. However, this provision has critical limitations: (a)

the court's power is discretionary and the requesting party has no enforceable right to document production; (b) German courts will only order production of specifically identified documents, not categories of documents relevant to a particular topic; (c) the requesting party must have prior specific knowledge of both the existence and the content of each document requested; (d) German courts cannot order a party to search its files for documents relating to a subject matter; and (e) German courts cannot enforce document production orders against foreign entities located outside Germany.

49. With respect to criminal proceedings, while the German prosecutorial authorities have investigative powers, including the ability to order searches and seizures regarding third parties to produce documents (§§ 94, 103 StPO), those powers are limited (a) to circumstances in which there are facts from which it can be concluded that the specific document sought is located in the premises to be searched and (b) to persons and entities within German jurisdiction. Documents held by Carlyle and its affiliates in the United States are beyond the reach of German criminal investigative authority. The existence of the Treaty between the Federal Republic of Germany and the United States of America on Mutual Legal Assistance in Criminal Matters dated October 14, 2003 and amended by the Supplementary Treaty to the Treaty between the Federal Republic of Germany and the United States of America on Mutual Legal Assistance in Criminal Matters, dated April 18, 2006 (hereinafter "bilateral Mutual Legal Assistance Treaty") does not alter this conclusion. Although the bilateral Mutual Legal Assistance Treaty empowers German prosecutorial authorities, including criminal courts, to request search, seizure, and transfer of any item, the request (a) is bound to the same aforementioned material restrictions and (b) cannot be enforced by German prosecutorial authorities in the event the request is denied.

50. I further understand from Petitioner that Petitioner is also not a party to any existing litigation directly with Carlyle through which it could obtain the discovery requested in this Application.

51. The evidence sought from Carlyle in the United States is therefore unavailable through German judicial processes. Carlyle is a U.S.-based entity; and neither German civil nor German criminal procedural rules provide any mechanism to compel production of the documents sought by Petitioner. The Section 1782 process is therefore the only available means by which Petitioner can obtain this evidence for use in the German Proceedings.

## IV. THE DISCOVERY SOUGHT AND ITS RELEVANCE TO EACH GERMAN PROCEEDING

52. The evidence sought through this Application consists of documents and testimony held by the Carlyle Group and its affiliates, subsidiaries, officers, directors, and employees who were involved in the SNP acquisition process, including Succession German BidCo GmbH and Carlyle Beratungs GmbH. As described above, I understand Carlyle entered into an NDA in relation to the SNP sale process in approximately September or October 2024, received the KPMG Financial Factbook [redacted], engaged in detailed negotiations with Marguerre, Biesinger, Berg and SNP management, submitted indicative bids and ultimately a binding offer, its affiliate entered into the Succession SPA with Marguerre, which covered approximately 65% of SNP's share capital, and thereafter was privy to the domination agreement process (including, as Petitioner alleges, the submission of materially false business plan projections to the § 293b AktG auditors by SNP). Carlyle is therefore not a peripheral witness. It is the central commercial witness of every transaction and arrangement that forms the subject matter of the German Proceedings, and no equivalent source of this evidence exists within German jurisdiction.

**A. Civil Complaints Against Marguerre for Misrepresentation and Fraud**

53. Because Marguerre [redacted], Carlyle's records will contain a comprehensive archive of everything Marguerre knew and shared about Petitioner, including information disclosed in breach of confidentiality undertakings. This information will be instrumental in respect of Petitioner's current Cease-and-Desist Proceedings in Germany.

54. Additionally, several of the contemplated civil cases against Marguerre rest on two interlocking propositions: that he possessed material non-public information at the time of the 2024 SPA, and that he actively concealed it from Petitioner. Carlyle's documents are indispensable to proving both.

55. Petitioner seeks from Carlyle (among other things): (i) all documents recording the date on which Carlyle first submitted an indicative or binding bid for SNP and the price or valuation range contained in that bid; (ii) all internal investment committee materials, valuation analyses, due diligence reports, and financial models relating to SNP, including Carlyle's own analysis of the KPMG Financial Factbook; (iii) all communications between Carlyle and Marguerre, Biesinger, Diener, Berg, or ParkView recording the key milestones of the sale process, including the dates on which the bidder pool was narrowed, NDAs were executed, the KPMG Financial Factbook was distributed, and final bids were submitted; and (iv) all communications in which the status of the sale process or the terms of any offer were discussed in the period between September and November 2024, including all communications in which the Petitioner-Marguerre share transaction (the 2024 SPA) was referenced.

56. Carlyle's own internal valuation of SNP (prepared with full access to the [redacted]) can provide evidence of the materiality of [redacted] from the perspective of a sophisticated market participant. If Carlyle valued

SNP materially above €[redacted] or €61 per share on the basis of [redacted], this corroborates that the price at which Marguerre purchased Petitioner's shares was achieved through exploitation of a profound information asymmetry. The precise date on which Carlyle submitted a binding or near-binding bid can establish, with documentary precision, how far advanced the acquisition process was on [redacted], when Marguerre countersigned the 2024 SPA. Carlyle's communications with Biesinger during the weeks surrounding the 2024 SPA signing can directly rebut any suggestion that the state of the Carlyle negotiations was uncertain at that time.

57. As to the quantum of Petitioner's civil damages claim, Petitioner seeks from Carlyle all documents in which Carlyle valued SNP in the period between October 2024 and June 2025, including any internal rate of return analyses, discounted cash flow models, or comparable company analyses prepared on the basis of the KPMG Financial Factbook. Carlyle's internal valuation materials (prepared by a leading global private equity firm with full access to all relevant information) can constitute powerful evidence of the true value of SNP shares at the relevant time, and can directly support Petitioner's damages calculation in the civil proceedings.

58. As to the breach of the [redacted], Petitioner seeks from Carlyle all documents recording when Carlyle first approached or was approached by Marguerre, Biesinger, or ParkView, and any communications in which the timing of the formal sale process launch was discussed. These documents will be directly relevant to establishing whether Marguerre deliberately and in bad faith delayed the launch of the formal sale process until [redacted]

**B. Criminal Complaints Against Various Individuals**

59. Petitioner seeks from Carlyle: (i) all documents and communications relating to the gift committed by Marguerre to Amail, including any discussions between Carlyle and Marguerre or SNP about that gift and whether Carlyle took any steps to assess its legal implications; (ii) all

communications between Carlyle and Amail in the period from Carlyle's first contact with SNP through the conclusion of the domination agreement; (iii) any retention, incentive, or management equity arrangements discussed with or offered to Amail by Carlyle; and (iv) any documents or communications in which the shareholder composition of SNP or the specific shareholdings of Petitioner were discussed by Carlyle with Marguerre, Amail, or any SNP employee. If SNP management provided shareholder register data to Carlyle or Marguerre in the context of the transaction, this can constitute evidence that Amail may have been the conduit through which Marguerre unlawfully obtained aforementioned confidential shareholder information. Communications that suggest such sharing of confidential shareholder information was in response to the gift committed by Marguerre to Amail would be significant to Petitioner's case.

60. Petitioner seeks from Carlyle: (i) all documents and communications in which the business plan projections to be submitted to the § 293b auditors were discussed between Carlyle and any SNP employee, officer, or advisor, including any comparison of those projections to [redacted]; (ii) all internal Carlyle documents in which the adequacy of the § 293b auditor projections was assessed or discussed, including any comparison between Carlyle's own internal SNP valuation and the valuation derived from those opinions; and (iii) all communications between Carlyle and ValueTrust or A&M at any time. If Carlyle's own internal valuation of SNP showed a value per share materially in excess of the compensation offered under the domination agreement, this will provide strong evidence that the business plans submitted to the auditors did not represent a genuine management forecast and that the resulting fairness opinions were correspondingly false. Any communications that include SNP board members and document the decision to present lower projections to the § 293b auditors will directly implicate the SNP board members who approved those projections.

## V. ADMISSIBILITY OF EVIDENCE OBTAINED PURSUANT TO SECTION 1782 IN THE GERMAN PROCEEDINGS

61. Evidence collected as a result of this Application will generally be admissible in German proceedings. Neither the ZPO nor the StPO nor German constitutional law contains any provision generally prohibiting the use of evidence obtained through foreign discovery procedures. German courts have routinely admitted and relied upon evidence obtained through Section 1782 proceedings in the United States.

62. The fact that the discovery obtained through this Application may be broader in scope than what could be ordered by a German court under § 142 ZPO does not render the evidence inadmissible. German courts retain discretion as to what evidence to allow and what weight to give it, and they are not precluded from admitting evidence merely because it was obtained through foreign pre-trial discovery. I am unaware of any German legal provision that would explicitly prohibit the use of Section 1782 evidence in German proceedings.

63. With respect to the criminal proceedings, evidence obtained through U.S. discovery and presented to German prosecutorial authorities in support of a criminal complaint (*Strafanzeige*) may properly be considered by the authorities in deciding whether to initiate a formal criminal investigation or to indict a person. German law does not provide a categorical bar to the use of foreign-obtained evidence in this context.

Executed in Berlin, Germany, on this 18th day of June, 2026.

Daniel Radig