# EXHIBIT A

**TO DECLARATON OF DANIEL RADIG IN SUPPORT OF THE APPLICATON FOR AN ORDER PURSUANT TO 28 U.S.C. 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

[redacted]

Lindemann Schwennicke & Partner | LSP

LSP · Lennéstraße 9 · 10785 Berlin

**elektronische Übermittlung per beA**

Landgericht Heidelberg
Kurfürsten-Anlage 15
69115 Heidelberg

Dr. Daniel Radig
Rechtsanwalt

Direkt: +49 (30) 25.46.09 – 141
Zentrale: +49 (30) 25.46.09 - 0
Fax: +49 (30) 25.46.09 - 100
daniel.radig@lspartner.de

Unser Zeichen:
DR/sh -

28. Mai 2026

**EILT – BITTE SOFORT VORLEGEN**

**Antrag auf Erlass einer einstweiligen Verfügung**

In der Sache

**Petrus Advisers Ltd.**, Petrus Advisers Ltd, 8th Floor, 6 New Street Square, New Fetter Lane, London EC4A 3 AQ, vertreten durch ihren Director, Herrn Klaus Umek, ebenda

**- Antragstellerin -**

Verfahrensbevollmächtigte: LSP Lindemann Schwennicke & Partner, Partnerschaft von Rechtsanwälten mit beschränkter Berufshaftung, Lennéstraße 9, 10785 Berlin

g e g e n

**Herrn Wolfgang Marguerre**, Philisophenweg 21, 69120, Heidelberg

**- Antragsgegner -**

beantragen wir namens und in Vollmacht der Antragstellerin, wegen besonderer Dringlichkeit ohne mündliche Verhandlung und durch den Vorsitzenden allein (gem. §§ 937 Abs. 2, 944 ZPO), den Erlass der folgenden einstweiligen Verfügung:

1. **Dem Antragsgegner wird im Wege der einstweiligen Verfügung untersagt, [redacted], eine öffentliche Schmutzkampagne gegen die Antragstellerin zu betreiben, die beispielsweise – aber nicht ausschließlich – beinhaltet, anderen Marktteilnehmern mitzuteilen, dass die Antragstellerin vertragliche Pflichten nicht erfülle, oder andere öffentlichkeitswirksame Maßnahmen zu betreiben, die gezielt den öffentlichen Ruf der Antragstellerin schädigen sollen.**

2. **Dem Antragsgegner wird im Wege der einstweiligen Verfügung untersagt, die Succession German Bidco GmbH oder andere Dritte [redacted]**

3. **Verstößt der Antragsgegner gegen diese einstweilige Verfügung, kann er bei jedem Verstoß mittels Zwangsgeld in Höhe von bis zu EUR 25.000,00, ersatzweise mittels Zwangshaft von bis zu 6 Monaten, zur Befolgung dieser einstweiligen Verfügung angehalten werden.**

Zum besseren Verständnis stellen wir unseren Ausführungen ein Inhaltsverzeichnis voran:

**A. Sachverhalt ..... - 4 -**

I. Verkauf der SNP Aktien des Antragsgegners an Succession ..... - 5 -

II. [redacted] ..... - 6 -

III. Bestätigung der Informationsweitergabe durch den Antragsgegner ..... - 7 -

IV. Befürchtungen schwerwiegender Schäden der Antragstellerin ..... - 8 -

**B. Rechtliche Würdigung ..... - 9 -**

I. Zulässigkeit ..... - 9 -

II. Begründetheit ..... - 9 -

1. Verfügungsanspruch ..... - 9 -

(a) Unterlassungsanspruch der Verbreitung falscher Tatsachen ..... - 9 -

(aa) Eingriff in das Recht am eingerichteten und ausgeübten Gewerbebetrieb ..... - 9 -

(bb) Rechtswidrigkeit des Eingriffs ..... - 10 -

(cc) Gefahr des Eingriffs ..... - 11 -

(dd) Der Antragsgegner ist Störer ..... - 11 -

(ee) Keine Duldungspflicht der Antragstellerin ..... - 11 -

(b) Unterlassungsanspruch der Informationsweitergabe ..... - 12 -

2. Verfügungsgrund ..... - 13 -

(a) Dringlichkeit der Unterlassung einer Schmutzkampagne ..... - 13 -

(b) Dringlichkeit der Unterlassung der Informationsweitergabe ..... - 13 -

3. Zulässigkeit der Vorwegnahme der Hauptsache ..... - 14 -

(a) Bestehen eines Verfügungsanspruchs ..... - 15 -

(b) Drohen irreversibler Schäden für die Antragstellerin ..... - 15 -

(c) Interesse der Antragstellerin überwiegt ..... - 15 -

**Begründung:**

## A. Sachverhalt

1. Die Antragstellerin und der Antragsgegner schlossen am 28. Oktober [redacted] 2024 ein sog. *Share Purchase Agreement* (dt.: Aktienkaufvertrag; im Folgenden: „**SPA Petrus-Marguerre**“) über die Übertragung von 100.000 Aktien der Schneider, Neureither und Partner SE (Im Folgenden „**SNP**“). Der Antragsgegner war zu diesem Zeitpunkt Mehrheitsaktionär der SNP mit ca. 64 % der Aktien.

2. Das SPA Petrus-Marguerre enthält [redacted].

**<u>Glaubhaftmachung:</u>** Aktienkaufvertrag zwischen Petrus Advisers und Wolfgang Marguerre vom 28. Oktober [redacted] 2024, **Anlage ASt 1**

3. [redacted]

4. Die Antragstellerin hat das SPA Petrus-Marguerre mit Schreiben vom 21. November 2025 aufgrund arglistiger Täuschung angefochten, da der Antragsgegner und sein Rechtsanwalt Herr Biesinger die Antragstellerin beim Vertragsabschluss über die Verkaufsabsichten seiner SNP Beteiligung arglistig täuschten. Entgegen den ausdrücklichen Beteuerungen von Herrn Biesinger waren Verkaufsverhandlungen über die Übernahme der SNP zum Zeitpunkt des Abschlusses des SPA Petrus-Marguerre bereits in den finalen Zügen. Der Antragsgegner ließ zudem von der Beratungsfirma KPMG ein financial Factbook über die SNP ausstellen, welches ihm am [redacted] ausgehändigt wurde. Hierin enthalten waren [redacted] die weit über den öffentlichen Zahlen der SNP lagen. Zudem liegt die Annahme nahe, dass der Antragsgegner [redacted] die Umsatzzahlen der SNP aus dem dritten Quartal 2024, die erst am 7. November 2024 veröffentlicht wurden, kannte. Sein Freund und

persönlicher Rechtsanwalt Herr Biesinger war zu diesem Zeitpunkt gleichzeitig Aufsichtsratsvorsitzender der SNP und hatte somit Zugang zu allen Umsatzprognosen. Die Antragstellerin wusste bereits [redacted] von der Existenz dieses Factbooks, erfuhr vom Inhalt dieses Factbooks jedoch erst [redacted] am 5. Mai 2026.

5. Die nachfolgenden Ausführungen erfolgen vor dem Hintergrund, dass das SPA Petrus-Marguerre bereits ex tunc nichtig ist und der Antragsgegner keine Ansprüche aus diesem herleiten kann.

## I. Verkauf der SNP Aktien des Antragsgegners an Succession

6. Am 23. Dezember 2024 schloss der Antragsgegner mit der Succession German Bidco GmbH (im Folgenden: „**Succession**"), einem über verschiedene Tochtergesellschaften verbundenen Investitionsvehikel des Unternehmens The Carlyle Group Inc. (USA), einer globalen Investmentgesellschaft, einen Aktienkaufvertrag über seinen gesamten Bestand an SNP-Aktien (im Folgenden: „**SPA Marguerre-Succession**").

**<u>Glaubhaftmachung:</u>** Aktienkaufvertrag zwischen Wolfgang Marguerre und Succession German Bidco GmbH vom 23. November 2024, **Anlage ASt 2**

7. [redacted]

8. [redacted]

[redacted]

9. [redacted]

**II.** [redacted]

10. [redacted]

11. [redacted]

12. [redacted]

**Glaubhaftmachung:** [redacted]
**Anlage ASt 3**

13. [redacted]

[redacted]

14. [redacted]

*„"Rohdaten Aktionärsidentifikation (§ 67d AktG)": Tabellarische Übersicht streiterheblicher Ergebnissen von Abrufen der SNP Schneider Neureither & Partner SE gemäß § 67d AktG in Anwendung der Aktionärsrechterichtlinie (SRD2) (Aktionärsliste), welche regelmäßige Abfragen ihrer Aktionäre vornimmt, reduziert um die nicht Petrus-SNP-Aktien betreffenden Aktionäre und exklusive personenbezogener Daten im datenschutzrechtlichen Sinne (vom 09. Februar 2026;* [redacted]

**<u>Glaubhaftmachung:</u>** [redacted]

15. Nach den Angaben des Antragsgegners stammen die Daten direkt von der SNP. Es liegt die Vermutung auf der Hand, dass der Antragsgegner an die SNP, eine nicht verfahrensbeteiligte Dritte, herangetreten ist und unter Offenbarung [redacted] die Herausgabe dieser Daten erbeten hat. Die unbefugte Weitergabe dieser Daten könnte im Übrigen auch strafrechtliche Implikationen nach sich ziehen, die wir derzeit prüfen.

**III. Bestätigung der Informationsweitergabe durch den Antragsgegner**

16. Mit Schreiben vom 20. März 2026, übermittelt per E-Mail am 13. April 2026 durch seine Rechtsanwälte, stellte Herr Klaus Umek, der Geschäftsführer der Antragstellerin, einen Antrag auf Auskunft über personenbezogene Daten gemäß Art. 15 DSGVO jeweils bei der Succession und bei der Carlyle Beratungs GmbH. Die Carlyle Beratungs GmbH, mit Anschrift Promenadenplatz 8, 80333 München, ist ebenfalls eine Tochter im Firmengeflecht der The Carlyle Group, Inc. Beide antworteten mit nahezu identischen Schreiben durch die Kanzlei KNPZ, zugestellt an die Antragstellerin am 12. Mai 2026. Hierin wird ausgeführt, dass die personenbezogenen Daten von Klaus Umek zum folgenden Zweck verarbeitet würden: *„die Bearbeitung und Verteidigung des Rechtsstreits zwischen Herrn Umek und unserer Mandantin im Zusammenhang mit der SNP-Transaktion“*. In beiden Schreiben wird zusätzlich ausgeführt, dass eine Offenlegung nach Art. 15 Abs. 4 DSGVO ausgeschlossen sei, da die *„Informationen als Teil der laufenden SNP-Transaktion und des damit verbundenen Rechtsstreits zwischen Herrn Umek und der Unternehmensgruppe unserer Mandantin“* dem Schutz als Geschäftsgeheimnisse unterliegen.

**Glaubhaftmachung:** Schreiben vom der Kanzlei KNPZ im Namen der Carlyle Beratungs GmbH vom 12. Mai 2026 S. 4, 7, **Anlage Ast 5**, Schreiben vom der Kanzlei KNPZ im Namen der Succession German Bidco GmbH vom 12. Mai 2026, S. 4, 7, **Anlage ASt. 6**

17. Die Succession und die Carlyle Beratungs GmbH gehen offenbar davon aus, dass es einen Rechtsstreit zwischen Klaus Umek und der Carlyle Unternehmensgruppe gibt. Das ist falsch. Einen Rechtsstreit [redacted] gibt es ausdrücklich nur zwischen der Antragstellerin und dem Antragsgegner. Es gibt keinen anderen Rechtsstreit zwischen Klaus Umek und der Succession oder der Carlyle Beratungs GmbH. Es hat den Anschein, als erfolgten derart enge Absprachen und Informationsweitergaben über das streng vertrauliche [redacted] zwischen der Carlyle Gruppe und dem Antragsgegner, sodass diese nun dem Irrglauben unterliegt, selbst in dem Rechtsstreit involviert zu sein.

## IV. Befürchtungen schwerwiegender Schäden der Antragstellerin

18. Es ist zu befürchten, dass der Antragsgegner seinen vertraglichen Verpflichtungen auf Informationsweitergabe und Absprache über [redacted] weiterhin gegenüber der Succession nachkommt. Die Antragstellerin muss damit rechnen, dass der Antragsgegner eine öffentliche Schmutzkampagne gegen die Antragstellerin durchführt.

19. Dies hätte negative Konsequenzen für den Geschäftsbetrieb der Antragsgegnerin. Aufgrund einer Schmutzkampagne könnten Marktteilnehmer vom Abschluss von Geschäften mit der Antragstellerin absehen oder diese künftig nur mit nachteiligen Konditionen vereinbaren. Die Antragstellerin hat keine Kontrolle darüber, an welche Dritten sich der Antragsgegner wenden könnte und welche Schritte dieser noch öffentlich ergreifen wird.

20. Eine Informationsweitergabe an die Succession birgt erhebliche Risiken für die Antragstellerin. Es besteht die Gefahr, dass vertrauliche Dokumente an unbeteiligte Dritte des [redacted] weitergeleitet werden. Insbesondere bei Befolgung der Herausgabe von Dokumenten im [redacted] droht eine direkte Weitergabe aller Dokumente. Ihr droht ein Kontrollverlust über alle Daten und Dokumente, die der Vertraulichkeit im [redacted] unterliegen und stattdessen an die Carlyle Unternehmensgruppe weitergeleitet werden.

21. [redacted]

22. Dem Antragsgegner wurde mit Schreiben vom 15. Mai 2026 per beA an seinen Prozessbevollmächtigten eine Aufforderung zur Abgabe einer Unterlassungserklärung im Hinblick auf die Weitergabe von Informationen aus dem [redacted] und das Unterlassen einer öffentlichen Kampagne übermittelt. Als Frist zur Unterschrift wurden ihm fünf Tage nach Zustellung gesetzt.

| | |
|---|---|
| **<u>Glaubhaftmachung:</u>** | Schreiben der Prozessbevollmächtigten der Antragstellerin vom 15. Mai 2026 samt Zustellnachweis per beA **Anlage Ast 7** |

23. Auf dieses Schreiben erfolgte keine Reaktion durch den Antragsgegner.

## B. Rechtliche Würdigung

### I. Zulässigkeit

24. Die Zuständigkeit des Gerichts ergibt sich aus § 937 ZPO i. V. m. § 71 Abs. 1 GVG i. V. m. §§ 12, 13 ZPO.

### II. Begründetheit

### 1. Verfügungsanspruch

25. Der Verfügungsanspruch der Antragstellerin ergibt sich bezüglich des Unterlassens einer öffentlichen Schmutzkampagne aus §§ 1004, 823 Abs. 1 BGB analog. Der Anspruch auf Unterlassen der Weitergabe von Informationen aus dem [redacted] ergibt sich aus [redacted].

#### (a) Unterlassungsanspruch der Verbreitung falscher Tatsachen

26. Die Antragstellerin kann vom Antragsgegner die vorbeugende Unterlassung rechtswidriger Eingriffe in ihr Recht am eingerichteten und ausgeübten Gewerbebetrieb, in Form der Verbreitung angeblicher Vertragsverstöße, nach §§ 1004, 823 Abs. 1 BGB analog verlangen.

#### (aa) Eingriff in das Recht am eingerichteten und ausgeübten Gewerbebetrieb

27. Das Recht am eingerichteten und ausgeübten Gewerbebetrieb schützt das gesamte Unternehmen der Antragstellerin. Der Schutzbereich umfasst alles, „was in seiner Gesamtheit den Gewerbebetrieb zur Entfaltung und Betätigung in der Wirtschaft befähigt, also nicht nur Betriebsräume und -grundstücke, Maschinen und Gerätschaften, Einrichtungsgegenstände und Warenvorräte, sondern auch Geschäftsverbindungen, Kundenkreis und Außenstände“. Geschützt werden soll der Gewerbebetrieb in seinem Bestand und in seinen Ausstrahlungen, soweit es sich

um gerade dem Gewerbebetrieb in seiner wirtschaftlichen und wirtschaftenden Tätigkeit wesensgemäße und eigentümliche Erscheinungsformen und Beziehungen handelt. (BGHZ 29, 65 (70) = NJW 1959, 479; BGHZ 23, 157 (162 f.) = NJW 1957, 630). Geschäftsverbindungen unterfallen explizit dem Schutzbereich. Der gute Ruf eines Unternehmens gehört zu dessen gesamtem Auftreten am Markt. Er strahlt insbesondere auf die wesensmäßige Betätigung am Markt aus. Der Ruf, ein zuverlässiger Geschäftspartner zu sein oder einen „ehrlichen" Betrieb zu führen, ist nötig, um Geschäftsbeziehungen aufrecht erhalten zu können und damit Marktteilnehmer mit der Antragstellerin zu marktüblichen Bedingungen kontrahieren.

28. In den Gewerbebetrieb wird im Wege eines unmittelbaren Eingriffs eingegriffen. Der Eingriff muss sich gegen den Betrieb als solchen richten, betriebsbezogen sein und nicht vom Gewerbebetrieb ohne weiteres ablösbare Rechte oder Rechtsgüter betreffen (BGHZ 29, 65, 70f., 74 = NJW 1959, 479; NJW 1977, 2264 = VersR 1977, 965; NJW 2004, 356 = VersR 2004, 255). Der Eingriff muss über das sozial übliche hinausgehen. Eine Mitteilung mit Falschbehauptungen der Vertragsbrüchigkeit an andere Marktteilnehmer in den einschlägigen Kreisen richtet sich gerade gegen den Betrieb der Antragstellerin als solchen und geht über eine bloße Belästigung und sozial übliche Behinderung hinaus. Konkurrenzkampf oder generelle Kritik ist sozial üblich – eine willentliche Falschbehauptung von Vertragsverletzungen nicht. Der Ruf der Antragstellerin ist ein fundamentaler Bestandteil ihres Betriebes. Anderen Marktteilnehmern mitzuteilen, die Antragstellerin erfülle ihre vertraglichen Verpflichtungen nicht, stellt einen direkten Eingriff in die Geschäftsbeziehungen und den guten Ruf der Antragstellerin dar.

**(bb) Rechtswidrigkeit des Eingriffs**

29. Ein solcher Eingriff des Antragsgegners ist rechtswidrig. Nach der vorzunehmenden Interessenabwägung würde das Interesse des Antragstellers seinen Gewerbebetrieb zu betreiben, ein Interesse des Antragsgegners an der öffentlichen Kampagne überwiegen. Gerade in Fällen, in denen es um die Verbreitung von (Falsch-)Informationen über ein Unternehmen geht, bedarf es einer einzelfallbezogenen Güterabwägung unter Berücksichtigung der Besonderheiten des zu beurteilenden Sachverhalts und der Bedeutung des Grundrechts der Meinungsfreiheit aus Art. 5 Abs. 1 GG. Dabei sind sowohl der Zweck der Äußerung oder Verbreitung als auch das Mittel zu prüfen, wobei auch die Art der Informationsbeschaffung nicht außer Betracht bleiben kann. Dies entspricht auch der ständigen

Rechtsprechung (BGHZ 73, 120 [124] = NJW 1979, 647; BGHZ 80, 25 [39] = NJW 1981, 1089 = LM Art. 5 GrundG Nr. 55; BGH, NJW 1987, 2667 = LM § 823 [Ai] BGB Nr. 95 = VersR 1987, 778). Der Antragsgegner kann ein berechtigtes Interesse an einer Meinungsäußerung nicht einmal im Ansatz geltend machen. Die Verbreitung der Information, die Antragstellerin würde ihren vertraglichen Verpflichtungen nicht nachkommen, ist keine Meinung, sondern eine Tatsache. Zweck der Verbreitung von diesen und anderen Informationen ist ausweislich des SPA Marguerre-Succession allein das Unter-Druck-Setzen der Antragstellerin dem [redacted] nachzukommen. Zur vermeintlichen Anspruchsdurchsetzung sind jedoch Gerichtsverfahren und klare rechtsstaatliche Strukturen da. Dementsprechend muss das Interesse der Antragstellerin an der ungestörten Ausübung seines Gewerbebetriebs überwiegen.

**(cc) Gefahr des Eingriffs**

30. Der Eingriff hat bereits begonnen oder steht kurz bevor und stellt eine Dauergefahr für die Antragstellerin dar. Der Antragsgegner ist vertraglich dazu verpflichtet, eine Schmutzkampagne vorzunehmen. Da er seinen vertraglichen Verpflichtungen bereits durch Einleiten des Schiedsverfahrens nachgekommen ist, liegt die Annahme nahe, dass er die weiteren vertraglichen Verpflichtungen ebenfalls erfüllen wird. Die vorzunehmende Handlung ist hinreichend konkret beschrieben, sodass der Antragsgegner ihr nachkommen muss, um nicht selbst vertragsbrüchig zu werden.

**(dd) Der Antragsgegner ist Störer**

31. Der Eingriff geht von dem Antragsgegner als Störer aus. Der Antragsgegner hat sich vertraglich zur Vornahme der Schmutzkampagne verpflichtet und muss die entsprechenden Handlungen selbst oder durch andere vornehmen, um nicht vertragsbrüchig zu werden.

**(ee) Keine Duldungspflicht der Antragstellerin**

32. Es besteht keine Duldungspflicht der Antragstellerin. Sie muss keine Verbreitung von unwahren Tatsachen und rufschädigenden Maßnahmen erdulden. Die Meinungsfreiheit des Antraggegners wird nicht berührt, da Vertragsbrüchigkeit eine Tatsache ist.

**(b) Unterlassungsanspruch der Informationsweitergabe**

33. Der Verfügungsanspruch auf Unterlassung von jeglicher Informationsweitergabe an die Succession über das Schiedsverfahren ergibt sich unmittelbar aus [redacted]

34. [redacted]

35. Nach [redacted] unterliegt [redacted] einer umfassenden Verschwiegenheitspflicht und einem umfassenden Offenlegungsverbot. Explizit erfasst von der Verschwiegenheitspflicht sind [redacted] Alles, was der Verschwiegenheitspflicht unterfällt, darf somit nicht an Dritte offenbart werden.

36. [redacted]

[redacted]: nur der Antragsgegner führt einen Rechtsstreit mit der Antragstellerin. Weitere Rechtsstreitigkeiten zwischen der Antragstellerin und der Carlyle Gruppe gibt es schlicht nicht.

## 2. Verfügungsgrund

37. Ein Verfügungsgrund ist gegeben. Die besondere Dringlichkeit (gem. §§ 937 Abs. 2, 944 ZPO) liegt vor. Der Antragstellerin ist ein Abwarten bis zum Abschluss eines ordentlichen Verfahrens nicht zumutbar, da ihr die Verwirklichung ihrer Rechte vereitelt würde. Es droht der Eintritt eines irreparablen Schadens.

### (a) Dringlichkeit der Unterlassung einer Schmutzkampagne

38. Zum einen ist zu befürchten, dass der Antragsgegner bereits begonnen hat, eine öffentliche Schmutzkampagne zu führen.

39. Wie bereits ausgeführt, ist eine konkrete Verletzungshandlung mit dem Informieren von anderen Marktteilnehmern bereits umschrieben worden. Der Antragsgegner hat bereit seine Verpflichtung [redacted] erfüllt. Daher ist es erwartbar, dass auch diese konkrete Handlung erfolgen wird, insbesondere um nicht selbst gegenüber der Succession vertragsbrüchig zu werden und um Druck [redacted] auszuüben.

40. Für das Vorliegen der erforderlichen Dringlichkeit spricht weiterhin, dass die Antragstellerin nicht beeinflussen kann, ob und wann sich der Antragsgegner an die Wettbewerber wendet. Jegliche Kontrollmöglichkeiten oder Möglichkeiten, ein solches Verhalten anderweitig zu unterbinden, sind ihr entzogen. Ein Warten auf ein Hauptsacheverfahren kann ihr nicht zugemutet werden. Zudem wurde dem Antragsgegner bereits eine Aufforderung zur Unterzeichnung einer Unterlassungserklärung geschickt. Der Antragsgegner hat auf diese nicht reagiert. Dies untermauert die Annahme, dass der Antragsgegner keine Handlung unterlassen wird, sondern im Gegenteil eine baldige Schmutzkampagne angestrebt wird.

### (b) Dringlichkeit der Unterlassung der Informationsweitergabe

41. Zum anderen liegt eine besondere Dringlichkeit bezüglich der Unterlassung der Informationsweitergabe vor. Die Offenlegung der gesamten Kommunikation und Dokumente aus [redacted] gegenüber der Succession sowie die eingeräumte Befugnis über [redacted] zu bestimmen, lässt die Succession wie eine faktische Dritte [redacted] auftreten, obwohl sie hierzu keinerlei Befugnisse hat. Nachdem die An-

tragstellerin [redacted] wiederholt darauf hingewiesen hat und [redacted] hat die Antragstellerin nun erst am 12. Mai 2026 davon erfahren, dass die Succession und die Carlyle Beratungs GmbH der Ansicht sind, sie seien selbst Partei eines Rechtsstreits mit Klaus Umek. Diese Behauptung, getroffen trotz anwaltlicher Vertretung, ergibt allein dann Sinn, wenn der Informationsfluss und die Absprachen über das Verfahren zwischen dem Antragsgegner und der Succession konstant seit Beginn des Verfahrens stattfanden. Die Absprachen müssen alle Vorgänge [redacted], inklusive der [redacted] umfassen, sonst lässt sich die Annahme selbst Partei eines Rechtsstreits zu sein, schlicht nicht erklären. Es besteht die akute Gefahr, dass jegliche im Rahmen [redacted] an den Antragsgegner übermittelten Dokumente an die Succession oder andere Dritte weitergegeben werden. Ein weiteres Abwarten und das Erdulden der Informationsweitergabe und eine dadurch erfolgende Beeinflussung [redacted] durch unbeteiligte Dritte ist der Antragstellerin nicht zumutbar.

42. Hinzukommt, dass der Antragsgegner im Rahmen [redacted]. Damit ist zu befürchten, dass die Existenz [redacted] noch weiteren unbeteiligten Dritten offenbart wird, da der Antragsgegner dies bereits einmal tat.

43. Unterstützt wird dies dadurch, dass der Antragsgegner dazu aufgefordert wurde, eine Unterlassungserklärung in Bezug auf die *S*chmutzkampagne und Informationsweitergabe abzugeben. Die Weigerung zur Abgabe einer solchen Erklärung spricht für die Absicht, die Handlungen wie geplant durchzuführen.

**3. Zulässigkeit der Vorwegnahme der Hauptsache**

44. Eine Unterlassungsverfügung in vorweggenommener Erfüllung des Hauptsacheanspruchs ist nur zulässig, wenn der Verfügungsgrund in einer ansonsten eintretenden irreparablen, eine Notlage verursachenden Schädigung liegt, der keiner vergleichbaren irreparablen Schädigung der Antragstellerin entspricht und die insbesondere ein späterer Schadensersatzanspruch nicht adäquat auszugleichen vermag (OLG Frankfurt a. M. Beschl. v. 2.2.2004 – 19 U 240/03, BeckRS 2004, 2787).

45. Ausnahmsweise ist die Vorwegnahme der Hauptsache hier zulässig. Es liegt ein Anspruch vor, ein irreparabler Schaden droht und eine Interessenabwägung fällt zugunsten des Antragstellers aus.

**(a) Bestehen eines Verfügungsanspruchs**

46. Wie dargelegt, besteht ein Anspruch auf Unterlassen einer Schmutzkampagne und ein Unterlassen der Informationsweitergabe aus [redacted]

**(b) Drohen irreversibler Schäden für die Antragstellerin**

47. Die zu erwartenden irreversiblen Schäden der Antragstellerin – Verlust des guten Rufs und die Möglichkeit, dass Dokumente über die Succession an die Öffentlichkeit geraten könnten – sind existenziell. Reputationsschäden sind nur schwerlich zu beziffern. Sie können durch einen späteren Schadensersatzanspruch nicht adäquat kompensiert werden. Es können sich wirtschaftliche Nachteile auf unbestimmte Zeit ergeben, sollte ein Gerücht gestreut werden, dass Petrus nicht vertragstreu sei. Marktteilnehmer können sich weigern, mit Petrus Verträge zu schließen oder nur zu Konditionen, die für Petrus sehr benachteiligend ausfallen.

48. Es besteht die ständige Gefahr, dass vertrauliche Dokumente an unbeteiligte Dritte [redacted] weitergeleitet werden und die Succession und die Carlyle Gruppe [redacted] beeinflussen. Es ist unkontrollierbar, wem der Antragsgegner noch die Existenz [redacted] offenbaren wird und Dokumente weitergeben wird. Eine Verbreitung von vertraulichen Dokumenten lässt sich ebenfalls nicht adäquat durch einen Schadensersatzanspruch ausgleichen. Der Kontrollverlust über Dokumente kann nicht rückgängig gemacht werden. Da ein Informationsfluss zwischen dem Antragsgegner und der Carlyle Gruppe anscheinend bereits seit Beginn besteht, sind die Ausmaße für die Antragstellerin nur schwerlich abschätzbar und können nur durch eine sofortige Unterlassung begrenzt werden.

**(c) Interesse der Antragstellerin überwiegt**

49. Die Interessen des Antragsgegners, insbesondere seine Meinungsfreiheit, sind nicht betroffen. Vertragsbrüchigkeit ist keine Meinung und kann erst [redacted] festgestellt werden. Eine öffentliche Schmutzkampagne zur Druckausübung zu führen um eine andere Partei zu Befolgung vermeintlicher Vertragspflichten zu zwingen, verstößt gegen rechtsstaatliche Grundsätze.

50. Der Antragsgegner ist selbst zur Verschwiegenheit nach [redacted] verpflichtet und hat sich durch die Akzeptanz der [redacted] der Verschwiegenheitspflicht selbst unterworfen. Wenn er, um dieser Verpflichtung nachzukommen, der Succession gegenüber vertragsbrüchig werden muss, fällt es allein in seinen Risikobereich.

51. Den Antragsgegner belastet die Unterlassung nicht. Er ist in der Führung des [redacted] oder seiner vermeintlichen Rechtsdurchsetzung in keiner Weise beschränkt. Auch bei späterer Aufhebung der Unterlassungsverfügung in einem Hauptprozess treten keine Schäden für ihn ein.

Der vorläufige Streitwert wird mit EUR 100.000,00 (jeweils 50.000 für jede zu unterlassender Handlung, basiert auf der Schwere der einzutretenden Schäden) beziffert.

Dieses Dokument ist elektronisch signiert, § 130a Abs. 3 ZPO.

Dr. Daniel Radig
- Rechtsanwalt -

# MACHINE TRANSLATION

Lindemann Schwennicke & Partner LSP

LSP · Lennéstraße 9 · 10785 Berlin

**electronic transmission via beA**

Heidelberg Regional Court
Kurfürsten-Anlage 15
69115 Heidelberg

Dr. Daniel Radig
lawyer

Direct: +49 (30) 25.46.09 – 141
Main office: +49 (30) 25.46.09 - 0
Fax: +49 (30) 25.46.09 - 100
daniel.radig@lspartner.de

Our sign:
DR/sh -

May 28, 2026

**URGENT – PLEASE PRESENT IMMEDIATELY**

# Application for an interim injunction

Regarding the matter

**Petrus Advisers Ltd. ,** 8th Floor, 6 New Street Square, New Fetter Lane, London EC4A 3AQ, represented by its Director, Mr. Klaus Umek, at the same address

**- Applicant -**

Legal representatives: LSP Lindemann Schwennicke & Partner, partnership of lawyers with limited professional liability,
Lennéstraße 9,
10785 Berlin

against

**Mr. Wolfgang Marguerre,** Philosophenweg 21, 69120, Heidelberg

**- Respondent -**

On behalf of and with the authority of the applicant, we request, due to particular urgency, without oral proceedings and by the chairman alone (pursuant to Sections 937 Paragraph 2, 944 of the German Code of Civil Procedure), the issuance of the following preliminary injunction:

1. **By way of preliminary injunction, the respondent is prohibited from conducting a public smear campaign against the applican [redacted] which includes, for example – but not exclusively – informing other market participants**

   **to announce that the applicant is not fulfilling contractual obligations, or to undertake other publicity-generating measures specifically designed to damage the applicant's public reputation.**

2. **By way of preliminary injunction, the respondent is prohibited from informing Succession German Bidco GmbH or any other third partie [redacted]**

3. **If the respondent violates this preliminary injunction, he may be subject to a coercive fine of up to EUR 25,000.00 for each violation, or alternatively,
   They may be compelled to comply with this injunction by means of coercive detention of up to 6 months.**

For better understanding, we have prefaced our explanations with a table of contents:

**A. Facts..........................................................................................................................- 4 -**

I. Sale of the respondent's SNP shares to Succession ..........................................- 5 -

I[redacted]........................................- 6 -

III. Confirmation of the disclosure of information by the respondent............................- 7 -

IV. Fears of serious harm to the applicant ...................................- 8 -

**B. Legal Assessment.........................................................................................................- 9 -**

I. Admissibility..........................................................................................................................- 9 -

II. Merits ..................................................................................................................- 9 - 1. Claim for injunctive

relief.........................................................................................- 9 - Claim for an injunction against the

(a) dissemination of false facts...............................- 9 -

(aa) Interference with the right to an established and operating business........- 9 -

(bb) Unlawfulness of the interference..........................................................................- 10 - (cc) Danger of the

interference .........................................................................................- 11 - (dd) The respondent is a

disturber...........................................................................- 11 - (ee) No obligation on the part of the applicant to

tolerate .......................................................- 11 - Claim for an injunction against the disclosure of

(b) information.........................................- 12 - 2. Ground for an

injunction .......................................................................................................- 13 - Urgency of preventing a smear

(a) campaign ...................................- 13 - Urgency of preventing the disclosure of information ...............................-

(b) 13 -

3. Admissibility of anticipating the main issue........................................................- 14 -

(a) Existence of a right to injunctive relief ...............................................................- 15 - Threat of irreversible

(b) damage to the applicant ..........................................- 15 - Applicant's interest outweighs the other party's

(c) interest ...............................................................- 15 -

**Reason:**

**A. Facts**

1. The applicant and the respondent concluded an agreement on October 2 [redacted], 2024. a so-called *Share Purchase Agreement* (hereinafter: **"SPA Petrus-Mar-guerre")** for the transfer of 100,000 shares of Schneider, Neureither und Partner SE (hereinafter referred to as **"SNP").** The respondent was at that time the majority shareholder of SNP holds approximately 64% of the shares.

2 [redacted] of the Petrus-Marguerre SPA contains a [redacted]

| | |
|---|---|
| **Proof of credibility:** | Share purchase agreement between Petrus Advisers and Wolfgang Marguerre dated October 2 [redacted], 2024, **Appendix ASt 1** |

[redacted]

4. The applicant notified the SPA Petrus-Marguerre by letter dated 21 November 2025. The decision was contested on the grounds of fraudulent misrepresentation, as the respondent and his lawyer, Mr. Biesinger, the applicant, at the conclusion of the contract regarding the sale intentions of his SNP The participants were fraudulently deceived. Contrary to Mr. Biesinger's explicit assurances, sales negotiations for the takeover of SNP were underway at the time of the conclusion of the contract. The SPA Petrus-Marguerre was already in its final stages. The respondent also commissioned the consulting firm KPMG to prepare a financial factbook on SNP, which was handed over to him o [redacted]. This factbook contained [redacted] hich were significantly higher than SNP's publicly available figures. Furthermore, it is reasonable to assume that the respondent had already received SNP's revenue figures from the third quarter o [redacted]. Q2 2024, which were only published on November 7, 2024, was known. His friend and

The applicant's personal lawyer, Mr. Biesinger, was at that time also Chairman of the Supervisory Board of SNP and thus had access to all sales forecasts. The applicant was aware of the existence of this factbook before th [redacted] began, but only learned of its contents during th [redacted] on May 5, 2026.

5. The following statements are made against the background that the SPA Petrus-Mar-
The war is already void ex tunc and the respondent cannot derive any claims from it.
can.

**I. Sale of the respondent's SNP shares to Succession**

6. On December 23, 2024, the respondent entered into an agreement with Succession German Bidco GmbH. (hereinafter referred to as **"Succession"),** a company linked through various subsidiaries The Carlyle Group Inc. (USA), an investment vehicle of the company, a global investment company, entered into a share purchase agreement for its entire holding of SNP shares (in The following: **"SPA Marguerre-Succession").**

| | |
|---|---|
| <u>**Proof of credibility:**</u> | Share purchase agreement between Wolfgang Marguerre and Succession German Bidco GmbH dated November 23, 2024, **Appendix ASt 2** |

7 [redacted]

8

Machine Translated by Google


[redacted]

[redacted]

II [redacted]

10 [redacted]

1 [redacted]

12 [redacted]

**Substantiation** [redacted]

[redacted]

13 [redacted]

[redacted]

14 [redacted]

*"Raw shareholder identification data (§ 67d AktG)": Tabular overview of disputed results of queries by SNP Schneider Neureither & Partner SE pursuant to § 67d AktG in application of the Shareholder Rights Directive (SRD2) (shareholder list), which regularly queries its shareholders, reduced by shareholders not relating to Petrus-SNP shares and excluding personal data within the meaning of data protection law (dated February 9, 2026;* [redacted]

**Proof of credibility:** [redacted]

15. According to the respondent, the data originates directly from the SNP. It is highly likely that the respondent contacted the SNP, a third party not involved in the proceedings, and, disclosing th [redacted], requested the release of this data. Furthermore, the unauthorized disclosure of this data could also have criminal implications, which we are currently examining.

**III. Confirmation of the disclosure of information by the respondent**

16. By letter dated 20 March 2026, transmitted by email on 13 April 2026 by his Lawyers, Mr. Klaus Umek, the managing director of the applicant, submitted an application Requests for information regarding personal data pursuant to Article 15 GDPR were submitted to both Succession and Carlyle Beratungs GmbH. Carlyle Beratungs GmbH, located at Promenadenplatz 8, 80333 Munich, is also a subsidiary within the corporate structure of The Carlyle Group, Inc. Both companies responded with nearly identical letters, delivered through the law firm KNPZ to the applicant on May 12, 2026. These letters state that Klaus Umek's personal data would be processed for the following purpose: *"the processing*

*and defense of the legal dispute between Mr. Umek and our client in the context of related to the SNP transaction."* Both letters further state that disclosure under Article 15(4) GDPR is excluded, since the *"information is part of the ongoing SNP transaction and the associated legal dispute between Mr. Umek and our client's corporate group"* are protected as trade secrets. are subject to nisse.

**Proof of credibility:** Letter from the law firm KNPZ on behalf of Carlyle Consulting GmbH dated May 12, 2026, pp. 4, 7, **Appendix Ast** 5,
Letter from the law firm KNPZ on behalf of the succession German Bidco GmbH, May 12, 2026, pp. 4, 7, **Appendix ASt. 6**

17. Succession and Carlyle Consulting GmbH apparently assume that there is a legal dispute between Klaus Umek and the Carlyle Group. This is incorrect.

Legal proceeding [redacted] are expressly only between the applicant and the Respondent. There is no other legal dispute between Klaus Umek and Succession or Carlyle Beratungs GmbH. It appears that such close agreements and information sharing regarding the strictly confidentia [redacted] took place between- the Carlyle Group and the respondent, so that they are now subject to the misconception- is to be involved in the legal dispute itself.

**IV. Fears of serious harm to the applicant**

18. It is to be feared that the respondent will fail to meet his contractual obligations based on information-
The applicant must continue to comply with the transfer of information and the agreement regarding [redacted] with respect to the succession. The applicant must expect that the respondent will conducts a public smear campaign against the applicant.

19. This would have negative consequences for the respondent's business operations. Because of
A smear campaign could deter market participants from entering into business transactions with the applicant or cause them to agree to such transactions only under unfavorable conditions in the future. The applicant has no control over which third parties the respondent might contact or what further public action the respondent might take.

20. Disclosing information to the Succession poses significant risks for the applicant.
There is a risk that confidential documents will be forwarded to uninvolved third parties in th [redacted]
In particular, complying with the [redacted] poses a risk.
Direct forwarding of all documents. You risk losing control over all data and documentation.
ments that are subject to confidentiality in [redacted] and are instead referred to Carlyle will be forwarded to the corporate group.

21 [redacted]

22. The respondent was notified by letter dated May 15, 2026, via beA, of his legal representative.

The authorized representative was served with a request to submit a cease-and-desist declaration regarding the disclosure of information from th [redacted] and the cessation of a public campaign. He was given five days from the date of service to sign the declaration.

lung set.

**Proof of credibility:** Letter from the applicant's legal representative dated May 15, 2026, including proof of service via beA, **Annex Ast 7**

23. The respondent did not respond to this letter.

## B. Legal assessment

### I. Admissibility

24. The court's jurisdiction is based on Section 937 of the Code of Civil Procedure in conjunction with Section 71 Paragraph 1 of the Courts Constitution Act.

Sections 12 and 13 of the Code of Civil Procedure.

### II. Justification

### 1. Right of disposal

25. The applicant's claim for injunctive relief regarding the cessation of a public smear campaign arises analogously from Sections 1004 and 823 Paragraph 1 of the German Civil Code (BGB). The claim for injunctive relief... The prohibition of disclosure of information from th [redacted]

#### (a) Claim for injunctive relief against the dissemination of false facts

26. The applicant can demand from the respondent the preventive cessation of unlawful interference with her right to her established and operating business, in the form of the dissemination of alleged breaches of contract, pursuant to §§ 1004, 823 para. 1 of the German Civil Code (BGB) by analogy.

gene.

#### (aa) Interference with the right to an established and operating business

27. The right to an established and operating business protects the applicant's entire enterprise. The scope of protection encompasses everything "that, in its entirety, enables the business to develop and operate in the economy, thus not only business premises and land, machinery and equipment, furnishings and inventory, but also business relationships, customer base and outstanding receivables." The business is to be protected in its existence and its impact, insofar as it

which are inherent and characteristic manifestations and relationships of a commercial enterprise in its economic and business activities. (BGHZ 29, 65 (70) = NJW 1959, 479; BGHZ 23, 157 (162 f.) = NJW 1957, 630). Business relationships explicitly fall within the scope of protection.

A company's good reputation is part of its overall market presence.
It particularly impacts the essential activities in the market. The reputation,
Being a reliable business partner or running an "honest" business is necessary to maintain business relationships and thus enable market participants to contract with the applicant on market-standard terms.
ren.

28. The business is being interfered with through a direct intervention.
The intervention must be directed against the business as such, and must be business-related.
and rights or legal rights that cannot be easily detached from the business.
The interference must affect goods (BGHZ 29, 65, 70f., 74 = NJW 1959, 479; NJW 1977, 2264 = VersR 1977, 965; NJW 2004, 356 = VersR 2004, 255).
going beyond the usual. A communication containing false allegations of breach of contract to other market participants in the relevant circles is directed at-
The lawsuit is directed against the applicant's business as such and goes beyond a mere objection. Beyond harassment and socially acceptable obstruction, competitive pressure or general criticism is socially acceptable – a deliberate false allegation of breach of contract is not. The applicant's reputation is a fundamental component of its business. Informing other market participants that the applicant is not fulfilling its contractual obligations constitutes a direct interference in the applicant's business relationships and its good reputation.

**(bb) Unlawfulness of the interference**

29. Such an intervention by the respondent is unlawful. According to the procedure to be carried out-
In a balancing of interests, the applicant's interest in operating his business would outweigh the respondent's interest in the public campaign. Particularly in cases involving the dissemination of (false) information about a company, a case-by-case balancing of interests is required, taking into account the specific circumstances of the case and the importance of the fundamental right to freedom of expression under Article 5 Paragraph 1 of the Basic Law. This includes considering both the purpose of the statement or dissemination...

both the dissemination and the means to be examined, including the type of information dissemination.
Creation cannot be disregarded. This also corresponds to the ongoing

Case law (BGHZ 73, 120 [124] = NJW 1979, 647; BGHZ 80, 25 [39] = NJW 1981, 1089 = LM Art. 5 GrundG No. 55; BGH, NJW 1987, 2667 = LM § 823 [Ai] BGB No. 95 = VersR 1987, 778). The respondent cannot even remotely assert a legitimate interest in the expression of opinion.
Dissemination of the information, the applicant would be fulfilling her contractual obligations. Failure to fulfill obligations is not an opinion, but a fact.
According to the SPA Marguerre-Succession, the sole purpose of disseminating this and other information is to pressure the applicant into complyin [redacted]
However, legal proceedings and clear rule-of-law structures exist for the alleged enforcement of claims.
Accordingly, the applicant's interest in undisturbed
The exercise of his business activities predominates.

**(cc) Risk of intervention**

30. The procedure has already begun or is imminent and poses a continuous danger to the applicant. The respondent is contractually obligated to...
to conduct a smear campaign. Since he has already fulfilled his contractual obligations by initiating the arbitration proceedings, the
It is reasonable to assume that he also fulfilled the other contractual obligations.
will fill. The required action is described with sufficient specificity that the respondent must comply with it in order not to breach the contract himself.
to become chic.

**(dd) The respondent is a disturber**

31. The intervention originates from the respondent as the perpetrator. The respondent has contractually committed himself to conducting the smear campaign and must therefore... to take appropriate actions oneself or through others in order not to breach the contract.

**(ee) The applicant has no obligation to tolerate the situation**

32. The applicant is under no obligation to tolerate this. She does not have to endure the dissemination of untrue facts or defamatory measures. The respondent's freedom of expression is not affected, as breach of contract is a
That's a fact.

**(b) Claim for injunctive relief against the disclosure of information**

33. The right to an injunction against any disclosure of information to the Succession via arbitration proceedings arises directl [redacted]

34. [redacted]

35. Accordin [redacted] are subject to a comprehensive duty of confidentiality and a comprehensive prohibition on disclosure. Explicitly covered by the duty of confidentiality ar [redacted] Anything subject to confidentiality must therefore not be disclosed to third parties.

36. [redacted]

For further clarification: only the respondent is conducting legal proceedings against the applicant.

Further legal disputes between the applicant and the Carlyle Group

It simply doesn't exist.

**2. Grounds for the order**

37. Grounds for an injunction exist. The particular urgency (pursuant to Sections 937 para. 2, 944 of the German Code of Civil Procedure) The applicant's case is closed. Waiting for the conclusion of formal proceedings is unreasonable, as this would prevent her from exercising her rights. Irreparable harm is imminent.

**(a) Urgency of ceasing a smear campaign**

38. Firstly, there is reason to fear that the respondent has already begun a public- to conduct a smear campaign.

39. As already stated, a specific infringement has already been described as informing other market participants. The respondent has already fulfilled its obligation to initiate [redacted]. Therefore, it is to be expected that

that this specific action will also be taken, in particular to avoid acting against

to breach the contract regarding the succession and to exert pressure i [redacted]

40. The fact that the applicant cannot influence whether and when the respondent contacts the competitors further supports the existence of the required urgency.

applies. Any means of control or possibilities to change such behavior-

The means to prevent further actions are no longer available to her. She cannot be expected to wait for a main hearing. Furthermore, the respondent has already been sent a request to sign a cease-and-desist declaration. The respondent has not responded to this. This reinforces the assumption that the respondent has no power to prevent further actions.

The lung will be omitted, but on the contrary, a smear campaign is being pursued soon.

becomes.

**(b) Urgency of ceasing to disclose information**

41. Secondly, there is a particular urgency regarding the cessation of information disclosure. This includes the disclosure of all communication and documents from [redacted] to the succession party, as well as the granted authority over

Determining th [redacted] leaves the succession like a de facto third party in the

[redacted] occur even though she has no authority to do so. After the application-

The plaintiff repeatedly pointed this out to th [redacted], and the [redacted]-
Since [redacted] the applicant
only learned on May 12, 2026, that Succession and Carlyle Beratungs GmbH believe they themselves are a
party to a legal dispute.
Disputes with Klaus Umek. This assertion, made despite legal representation, results in
It only makes sense if the flow of information and the agreements about the procedure
Agreements between the respondent and the succession must have been in place consistently since the
commencement of the proceedings. These agreements must encompass all aspects of [redacted] including
[redacted]; otherwise, their acceptance cannot be guaranteed.
Being a party to a legal dispute is simply inexplicable. There is an acute risk of...
risk that any documents transmitted to the respondent within the framewor [redacted] will be
passed on to the succession or other third parties. Further waiting and tolerating the disclosure of information
and the resulting consequences is unacceptable.
The applicant objects to undue influence on th [redacted] by uninvolved third parties.
The student is not acceptable.

42. Furthermore, the respondent apparently disclosed the existence of [redacted]. Therefore
It is feared that the existence o [redacted] will attract the attention of further uninvolved parties.
It will be disclosed to third parties, as the respondent has already done so once.

43. This is supported by the fact that the respondent was requested to issue a cease and desist declaration
regarding the smear campaign and the disclosure of information.
to submit. The refusal to submit such a declaration suggests the intention to
to carry out the actions as planned.

**3. Admissibility of anticipating the main issue**

44. An injunction issued in anticipation of the fulfillment of the main claim is
Only permissible if the grounds for the injunction lie in an otherwise occurring irreparable harm causing an emergency,
which does not correspond to any comparable irreparable harm suffered by the applicant and which, in particular,
cannot be adequately compensated by a subsequent claim for damages (Higher Regional Court of Frankfurt am Main,
Decision of February 2, 2004 – 19 U 240/03).
BeckRS 2004, 2787).

45. Exceptionally, anticipation of the main issue is permissible here. A claim exists.
if irreparable damage is imminent and a balancing of interests favors the application-
exhibitors out.

**(a) Existence of a right to injunctive relief**

46. As explained above, there is a right to an injunction against a smear campaign and an injunction against the disclosure of information from the arbitration proceedings pursuan [redacted]. Already.

**(b) Are irreversible damages likely to occur for the applicant?**

47. The applicant's expected irreversible damage – loss of reputation and the possibility that documents concerning the succession could be made public. They could – are existential. Reputational damage is difficult to quantify. They can- which cannot be adequately compensated by a subsequent claim for damages. Economic disadvantages could arise indefinitely should a rumor spread. Rumors are spread that Petrus is not faithful to his contracts. Market participants may refuse to enter into contracts with Petrus or only do so under conditions that are very unfavorable to Petrus. turn out to be detrimental.

48. There is a constant risk that confidential documents will be passed on to uninvolved third parties in th [redacted] and that Succession and the Carlyle Group will influence the proceedings. It is impossible to control to whom the respondent will disclose the existenc [redacted] The dissemination of confidential documents cannot be adequately prevented by a Compensate for damages. The loss of control over documents cannot be compensated. can be reversed. Since there is an information flow between the respondent and Since the Carlyle Group's actions have apparently existed since the beginning, the extent of the problem is difficult for the applicant to assess and can only be limited by an immediate cessation.

**(c) The applicant's interest prevails.**

49. The respondent's interests, in particular his freedom of expression, are not affected. Breach of contract is not an opinion and can only be decide [redacted] to be determined. To conduct a public smear campaign to exert pressure in order to Forcing another party to comply with alleged contractual obligations violates the principles of the rule of law.

50. The respondent is himself bound to secrecy pursuan [redacted]. and has, [redacted], committed itself to the duty of confidentiality. subjected. If, in order to fulfill this obligation, he faces the succession If the contract is breached, it falls solely within his sphere of risk.

51. The respondent is not adversely affected by the omission. He is in no way restricted in conducting [redacted] or in enforcing his alleged rights.

Even if the injunction is subsequently overturned in a main trial, no harm to him.

The preliminary value in dispute is set at EUR 100,000.00 (50,000 for each action to be omitted, based on the severity of the damage to be incurred).

This document is electronically signed, § 130a para. 3 ZPO.

Dr. Daniel Radig
- Lawyer -